UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00036-TBR

EDITH GRAY,                                                                                               PLAINTIFF

v.

MIDLAND FUNDING, LLC,                                                                          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on several pending motions, most notably Defendant Midland Funding, LLC's Motion to Compel Arbitration and Stay or Dismiss the Proceeding Pending Arbitration, [DN 17], pursuant to the parties' written Credit Agreements and the Federal Arbitration Act, 9 U.S.C. § 3. Because there are disputed questions of fact concerning the formation of those Agreements, however, the Court **SHALL** hold an evidentiary hearing before resolving Midland's motion.

BACKGROUND

In December 2010, Gray opened a MetaBank credit card account with Bluestem Brands, Inc. f/k/a Fingerhut Direct Marketing ("Bluestem"). [DN 17 at 2.] It is unclear how exactly Gray opened this account; that is, whether she opened it online or over the phone. Gray used the "account exclusively for personal, family, and household purposes . . ." [DN 12 at 2.] At the time Gray opened her account, the applicable credit agreement was the MetaBank Fingerhut Credit Account Agreement (the "MetaBank Credit Agreement"). [DN 17-1 at 4.] The MetaBank Agreement contained an arbitration provision which stated, in pertinent part:

> if a dispute of any kind arises out of this Agreement, either you or we, at our sole discretion, can choose to have that dispute resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or to have a jury trial on that claim, or to engage in prearbitration discovery, except as provided for in the arbitration rules. In

1

> addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration . . . .

[*Id.* at 8.]

Then, pursuant to an Account Transfer Agreement, "MetaBank sold, assigned, and conveyed" multiple accounts, including Gray's, to WebBank. [*Id.* at 4.] The applicable credit agreement remained the same in substance but was updated in form and re-titled the "WebBank Fingerhut Credit Account Agreement" in July 2012 (the "July 2012 WebBank Credit Agreement"). [*Id.*] That agreement was then updated in March 2013 (the "March 2013 WebBank Credit Agreement"), and Midland claims that Bluestem sent notice of these changes to Gray. [*Id.* at 3–4.] The March 2013 WebBank Credit agreement contained the following arbitration provision:

> Arbitration. Please review this provision carefully. It provides that any dispute may be resolved by binding arbitration. Arbitration replaces the right to go to court and the right to have a jury decide a dispute. Under this provision, your rights may be substantially limited in the event of dispute. You may opt out of this Arbitration provision by following the instructions below.
>
> By accepting this Agreement, unless you opt out by following the instructions below, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement of our relationship resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that dispute in court or to have a jury trial on that dispute. Pre-arbitration discovery will be permitted only as allowed by the arbitration rules. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any dispute subject to arbitration.

[*Id.* at 16.] The March 2013 WebBank Credit Agreement went on to explain that,

> [f]or purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision . . .

2

> Disputes brought as part of a class action or other representative basis are subject to arbitration on an individual (non-class, non-representative) basis.
>
> . . .
>
> You have the right to opt out of this Arbitration provision, but you may only do so in the first 30 days after the first transaction is posted to your Account . . . .
>
> This Arbitration provision shall survive repayment of your extension of credit and termination of your Account.

[*Id.*] The March 2013 WebBank Credit Agreement, in a separate provision, stated that WebBank "may sell, assign or transfer your Account or any portion thereof without notice . . . ." [*Id.* at 17.]

Gray made her final purchase by telephone on January 2, 2013, before the March 2013 changes went into effect. [DN 17-1 at 4 (Svenson affidavit).] Her last payment posted to her account on April 3, 2013. [*Id.* at 5.] Eventually, Gray defaulted on her credit card debt, resulting in WebBank charging off her account on November 11, 2013 with a balance of $1,472.97.[1] [*Id.* at 5.] In a Bill of Sale dated November 25, 2013, WebBank sold certain accounts, including Gray's, to Bluestem. [*Id.* at 22.] The Bill of Sale provided that "FOR VALUE RECEIVED . . . [WebBank] does hereby transfer, assign and convey to Bluestem Brands, Inc., as of the date hereof, all right, title, and interest of [WebBank] in and to those certain Charged-Off Accounts described in Schedule 1 attached hereto and made a part hereof for all purposes." [*Id.*]

On November 29, 2013, Bluestem then sold and assigned various charged-off accounts, including Gray's, to Midland Funding, the entity that currently holds Gray's debt. [*Id.* at 26.] The Bill of Sale for this transaction likewise provided that Bluestem sold, assigned, and transferred to Midland "all of [Bluestem's] rights, title and interest in each and every one of the Purchased Accounts described in the Agreement." [*Id.*]

---

[1] A "charge off" occurs when a bank declares a credit card debt uncollectible, "usually because of cardholder bankruptcy, debt or prolonged delinquency . . . ." U.S. Gov't Accountability Office, GAO-09-748, Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology (2009), at 5.

3

On June 30, 2015, Midland filed suit against Gray in Graves County, Kentucky District Court, seeking to collect Gray's outstanding credit card debt. [DN 12 at 2.] Midland obtained a default judgment against Gray on August 21, 2015 [DN 12-2 at 2.] The judgment awarded Midland "the sum of $1,472.97 less credit adjustment by Plaintiff of $75.00 and court costs of $73.50, for all of which it may have execution." [*Id.*] Pursuant to the judgment, Midland filed a Notice of Judgment Lien on Real Estate on September 22, 2015. [DN 12-3 at 2.] Midland paid the $13.00 fee to record the judgment lien. [DN 12 at 5–6.] Midland's counsel later sent Gray two collections letters that sought to collect from Gray both the judgment and the $13.00 fee. [DN 12 at 3–4; DN 12-4; DN 12-5.]

Gray filed the instant action on March 17, 2016, and an Amended Complaint on July 6, 2016, alleging that Midland violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq* in two ways. [DN 1; DN 12.] Because, according to Gray, "[l]ien recording fees paid to county clerks are not costs recoverable by a prevailing party in litigation under Kentucky law," and because Midland failed to file a bill of costs as required by Kentucky Rule of Civil Procedure 54, Midland engaged in illegal collection conduct. [DN 12 at 3–4.]  Gray further alleges that Midland engaged in a pattern and practice of violating the FDCPA by routinely seeking to recover lien recording fees to which it is not entitled and seeks certification of the following proposed class of individuals:

> All Kentucky consumers against whom Defendant Midland Funding, LLC, its agents or representatives, as part of its post-judgment collection conduct, within one year prior to the date of filing the original complaint filed in this action:
>
>> (a) obtained a judgment in a Kentucky state court and thereafter recorded a "Notice of Judgment Lien On Real Estate" pursuant to such judgment with any County Clerk of the Commonwealth of Kentucky and thereafter collected, or attempted to collect from such consumer the $13.00 statutory lien recording fee paid by Midland Funding LLC to record the statutory lien.

4

[*Id.* at 5–6.]

Midland answered the complaint, [DN 14], and shortly thereafter filed this motion for an order staying or dismissing the action and compelling the dispute to arbitration. [DN 17.] Gray responded, [DN 20], and Midland replied. [DN 23.]

## STANDARD

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, "embodies [a] national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007)). Under the Act, a written agreement to arbitrate disputes arising out of a contract or transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There are "two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).

Before granting a stay under 9 U.S.C. § 3, the Court "must engage in a limited review to determine whether the dispute is arbitrable," meaning "[1] that a valid agreement to arbitrate exists between the parties and [2] that the specific dispute falls within the substantive scope of the agreement." *Richmond Health Facilities*, 811 F.3d at 195 (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)); *see also Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004). In performing its task, the Court approaches factual questions as it would at the summary judgment stage. *See Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002); *Yaroma v. Cashcall, Inc.*, 130 F. Supp. 3d 1055, 1062 (E.D. Ky. 2015). If the Court is

satisfied that the parties formed a valid agreement to arbitrate, it must stay litigation involving such a dispute until the parties resolve it in the contracted-for manner. *See* 9 U.S.C. § 3. If there are disputed questions of fact concerning the formation of such an agreement, then the Court should hold an evidentiary hearing to resolve the question. *See Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 425 (S.D.N.Y. 1978); *Marshall v. Green Giant Co.*, No. 4-83-578, 1985 WL 2458, at *2–3 (D. Minn. Aug. 7, 1985); *cf. Commerce Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 340 (5th Cir. 1984) (holding no evidentiary hearing to be necessary in the absence of "disputed factual questions going to the legal issue of arbitrability").

## DISCUSSION

This case involves a familiar scenario. Edith Gray incurred credit card debt which, for one reason or another, she did not pay. MetaBank, Gray's original creditor, sold her debt, and after a series of transactions, Midland now holds it. Midland sued Gray in state court to recover the debt, and obtained a default judgment. In this suit, Gray alleges that Midland violated the FDCPA through its attempts to collect the debt. Midland now seeks to invoke the arbitration provisions contained in the Credit Agreements.

The principal issue in here is whether a valid agreement to arbitrate exists in the first place. Because arbitration agreements are, in essence, contracts, Kentucky law guides the Court's inquiry into the question of contract formation.[2] *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *Seawright*, 507 F.3d at 972. In Kentucky, like in all jurisdictions, a contract is enforceable only if both parties agree to be bound by it. *See Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 456 (Ky. 2009) (citing *Courtney Shoe Co. v. E.W. Curd & Son*, 134 S.W. 146 (Ky. 1911); *Henry Clay Fire Ins. v. Denker's Ex'x*, 290 S.W. 1047 (Ky. 1927)). Typically, contracting

---

[2] Although Midland argues in its motion that South Dakota law governs the MetaBank Credit Agreement, [DN 23 at 8], Kentucky law governs whether that Agreement was, in fact, formed.

parties "manifest their agreement by signing the contract." *Braxton v. O'Charley's Rest. Props., LLC*, 1 F. Supp. 3d 722, 726 (W.D. Ky. 2014). Yet, Kentucky courts will still enforce "unsigned arbitration agreements where the parties have indicated acceptance of the contract through their actions." *Id.* (quoting *Polly v. Affiliated Comput. Servs., Inc.*, No. 10-135-ART, 2011 WL 93715, at *2 (E.D. Ky. Jan. 11, 2011)).

Here, Gray maintains, in essence, that she opened her credit account over the phone, made purchases exclusively over the phone, never visited the Fingerhut website, never placed an online order, and in fact does not own a computer. [DN 20-1 at 2–3.] Further, Gray maintains that she never received a credit card associated with her Fingerhut credit account. [*Id.* at 3.] According to Midland, though, Gray opened her account online through an online application, the application contained the terms and conditions of the MetaBank Credit Agreement, and that Gray's application could not have been processed until she clicked a box labeled "Yes! I accept these terms." [DN 23 at 6 (citing DN 23-1 at 3–4).] Moreover, Midland contends that Gray indicated her acceptance of the MetaBank Credit Agreement as a matter of law through her conduct after the agreement was mailed to her, she used the credit card, and she made payments on her account. [*Id.* at 7–10.] However, viewing the record in the light most favorable to Gray, the nonmoving party, the Court finds a genuine dispute of material fact concerning whether Gray manifested her assent to the MetaBank Credit Agreement or the other two Credit Agreements. Accordingly, the Court must conduct an evidentiary hearing before resolving Midland's motion. *Tassy v. Lindsay Entm't Enterprises, Inc.*, No. 3:16-CV-00077-TBR, 2016 WL 3748544, at *3 (W.D. Ky. July 8, 2016).

Contrary to Midland's contentions, it is far from undisputed that "Gray is subject to and agreed to all of the terms of [all of] the Credit Agreements, including the arbitration provisions."

7

[DN 17 at 9.] With regard to the first Agreement, the MetaBank Credit Agreement, Gray swears in her affidavit that she did not open her Account online and in fact that she has never visited the Fingerhut website. [DN 20-1 at 2.] A logical inference from this is that Gray did not "explicitly agree[]" to the MetaBank Credit Agreement by assenting to a clickwrap agreement on the Fingerhut website, as Midland avers. [DN 23 at 6–7 (citing DN 23-1 at 3–4).] Accordingly, Gray's unequivocal denial that she opened her Account online makes this fact genuinely disputed. *Braxton*, 1 F. Supp. 3d at 727.

Nor does the Court agree, as Midland argues, that the statements Gray makes in her affidavit are "demonstrably false" and therefore must be disregarded. [DN 23 at 1; DN 27 at 10–11.] For this assertion, Midland argues that it has proof that Gray opened her account online. First, in his affidavit, Erik Svensen states that "Bluestem's records indicate that Gray applied for a MetaBank-originated, Fingerhut-branded, credit account . . . through an online application." [DN 23-1 at 3.] However, as noted above, Gray's statements to the contrary make this fact genuinely disputed, and Midland has not provided the Court with an actual copy of Gray's online application. Second, Midland states that "Bluestem's records indicate that Gray entered numerous pieces of information when completing the online application, including" her name, address, phone number, social security number, date of birth, and email address. [*Id.* at 3.] But the exhibit Midland attached to support this contention is merely a list of Gray's information from its records, which could have been provided by Gray whether she opened her account online or over the phone. [*See i*d. at 9.] Accordingly, Midland has not demonstrated the falsity of Gray's statements that she opened her account over the phone and never visited the Fingerhut website.

Midland further argues that, even if Gray did not explicitly consent to the clickwrap agreement on the Fingerhut website, she became bound by the MetaBank Credit Agreement after she was mailed the terms and conditions, continued to use her account, and made payments on her account. [DN 23 at 7–10.][3] To be sure, parties can bind themselves to a contract, even absent a signature, through actions indicating acceptance of the contract's terms. *See Spears v. Carhartt, Inc.*, 215 S.W.3d 1, 9 (Ky. 2006); *Braxton*, 1 F. Supp. 3d at 727–28; *Aldrich v. Univ. of Phoenix, Inc.*, 661 F. App'x 384, 390–91 (6th Cir. 2016). The question, therefore, becomes whether Gray's conduct evidenced her acceptance of the MetaBank Credit Agreement. Here, the record is unclear as to this point.

For the argument that Gray did manifest her consent, Midland cites to *Athon v. Direct Merchants Bank*, No. 5:06-CV-1CAR, 2007 WL 1100477, at *4 (M.D. Ga. Apr. 11, 2007). In that case, the court determined that, although the plaintiff denied ever receiving his credit card agreement or arbitration agreement, "the totality of the evidence establishe[d] otherwise." *Id.* The court in that case stated that "[t]he law recognizes a rebuttable presumption that an item properly mailed was received by the addressee." *Id.* (citations omitted). Applying that principle, the court found that

> the credit card, Cardmember Agreement, and Arbitration Agreement were mailed to Plaintiff's address as part of a routine process. Furthermore, these agreements were mailed to the same address that Plaintiff's billing statements were mailed, statements Plaintiff not only acknowledges he received but also to which he responded in the form of payments, thereby indicating that the mail did, in fact, reach him. Accordingly, the Court can presume that Plaintiff and his wife

---

[3] Though Midland first points to a South Dakota statute for this argument, [DN 23 at 8], because Kentucky law applies to determine whether an agreement was ever entered into between the parties, and therefore whether the choice of law clause in the agreement ever became effective, the Court cannot rely on that statute here. *Seawright*, 507 F.3d at 972 ("Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation."); *Aldrich v. Univ. of Phoenix, Inc.*, 661 F. App'x 384, 390 (6th Cir. 2016) ("State law—here, Kentucky law—governs whether a contract was formed.")

>received the original Cardmember Agreement and subsequent Arbitration Agreement.

*Id.* Here, Svensen avers that, after Gray opened her Account, Bluestem mailed her a "Welcome Kit" pursuant to its regular business practices which included a Fingerhut credit card, Fingerhut and MetaBank privacy policies, and the MetaBank Credit Agreement. [DN 23-1 at 4.] However, here, Gray swears in her affidavit that she "did not receive a credit card for the Fingerhut credit account." [DN 20-1 at 3.] Because Svensen states that the MetaBank Credit Agreement was mailed to Gray along with the Fingerhut credit card, which Gray avers she never received, viewing the record in the light most favorable to Gray, a reasonable inference to draw is that Gray also did not receive the MetaBank Credit Agreement. Therefore, although it is true that Gray used her account, was mailed billing statements, and made payments on her Account after she opened it, the Court also finds a disputed issue, however slight, as to whether Gray manifested acceptance of the MetaBank Credit Agreement through her conduct.

Additionally, Midland argues that, pursuant to language in the MetaBank Credit Agreement and the July 2012 WebBank Credit Agreement which provides that Gray would be bound by those agreements from the first time a transaction was posted to her Account, [DN 17-1 at 8; DN 17-1 at 11], Gray became bound to those agreements by virtue of the fact that she owned and used her Account. [DN 17 at 9 (citing DN 12 at 2).] However, for those provisions to be enforceable, the Court must first determine that those agreements were entered into at all. Because the Court has determined that genuine factual disputes exist as to this determination, it cannot consider those provisions at this time.

Finally, the Court also cannot yet say whether Gray manifested her assent to the second or third Credit Agreements. As to the July 2012 WebBank Credit Agreement, Midland only contends that this agreement was made available to Gray on the Fingerhut website. [DN 17-1 at

10

4.] However, as Gray has stated in her affidavit that she never visited that website, there is a dispute as to this point as well. With regard to the third agreement, the March 2013 WebBank Agreement, before the Court can determine whether Gray was bound by that Agreement, the Court must first determine whether Gray was ever bound by the MetaBank Credit Agreement or the July 2012 WebBank Credit Agreement. Accordingly, the Court must wait to make this determination until after an evidentiary hearing.

Though Gray maintains that a jury trial must be held to resolve any questions of fact surrounding the issue of contract formation, [*see* DN 24], she is mistaken. Unlike a motion to compel arbitration under 9 U.S.C. § 4, a motion to stay proceedings pending arbitration under 9 U.S.C. § 3 affords no right to a jury trial. *See Oasis Oil & Ref. Corp. v. Armada Transp. & Ref. Co.*, 719 F.2d 124, 126 (5th Cir. 1983); *J & R Sportswear & Co. v. Bobbie Brooks, Inc.*, 611 F.2d 29, 30 (3d Cir. 1979); *Griffen v. Alpha Phi Alpha, Inc.*, No. 06-1735, 2007 WL 707364, at *3 n.7 (E.D. Pa. Mar. 2, 2007); *Marshall*, 1985 WL 2458, at *2–3; *see also Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 837–74 (7th Cir. 1985) (Posner, J.). The plain language of 9 U.S.C. § 3 refers to the Court "the decision on an application for a stay." *J & R Sportswear & Co.*, 611 F.2d at 30. "By means of an evidentiary hearing," then, the Court will pass on any disputed questions of fact necessary to resolve Midland's motion. *Fyrnetics (Hong Kong) Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1027 (7th Cir. 2002); *see also Todd*, 78 F.R.D. at 425; *Ventimiglia v. Gruntal & Co.*, No. 88 CIV. 1675 (RJW), 1989 WL 251402, at *7 (S.D.N.Y. Nov. 1, 1989); *Marshall*, 1985 WL 2458, at *2–3.

Along with her request for a jury trial, Gray requests that "the Court . . . allow her to conduct discovery on the limited issue of the existence of a valid agreement to arbitrate." [DN 24 at 10.] However, Gray has not told the Court what discovery she seeks, why it would be

necessary, and how that discovery would be reasonably calculated to the Court's determination of whether a valid Agreement was entered into. Accordingly, on the record the Court has before it now, Gray's motion for discovery is denied. Should Gray seek to point the Court to specific discovery she believes is necessary prior to the Court's evidentiary hearing, the Court will consider that at that time.

## CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

1. At the Telephonic Status Conference scheduled for **April 5, 2017 at 9:30 a.m. CT**, the Court will schedule an evidentiary hearing.

2. Plaintiff's Motion for the Court to Order Discovery and for a Jury Trial on the Issue of the Existence of an Agreement to Arbitrate [DN 24] is **DENIED.**

3. Plaintiff's Motion to Strike Exhibit [DN 25] is **DENIED AS MOOT**.

4. Plaintiff's Motion to File Sur-Reply to Defendant's Reply to Plaintiff's Response to Defendant's Motion to Compel Arbitration. [DN 31] is **DENIED**.

cc:   Counsel

Thomas B. Russell, Senior Judge
United States District Court

April 4, 2017